NUMBER 13-04-297-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


DAISY (DEE) MARIE KELSO,

INDIVIDUALLY, AND JAMES

DOUGLAS KELSO, INDIVIDUALLY, Appellants,


v.



ROBERT A. WILLIAMSON, M.D., Appellee.

 


On appeal from the 25th District Court of Gonzales County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Hinojosa and Yañez


Memorandum Opinion by Justice Yañez


 

 In this medical malpractice case, appellants, Daisy (Dee) Marie Kelso and her
husband, James Douglas Kelso, (1) contend, in a single issue, that the trial court erred in
granting a directed verdict in favor of appellee, Robert Williamson, M.D. (2) We agree, and
reverse and remand.

I. Background 


 On the morning of October 25, 1999, Kelso began experiencing nausea, vomiting,
and pain in her neck and shoulder. After contacting her mother and husband, she arrived
at the hospital emergency room at approximately 10:10 a.m. Emergency room personnel
called Kelso's family physician, Dr. Williamson, at 10:25 a.m. Dr. Williamson returned the
call to the emergency room at 10:30 a.m. and spoke to Teresa Koch, a licensed vocational
nurse. By telephone, Dr. Williamson ordered medication to relieve the nausea and
vomiting, blood work for various tests, and diagnostic procedures, including a chest X-ray
and an electrocardiogram (EKG). 

 Nurse Koch performed the EKG on Kelso at 10:50 a.m. The EKG machine
determined that Kelso's EKG was not normal and printed out a statement that she suffered
from an "acute MI," or heart attack. There is conflicting testimony regarding whether Dr.
Williamson told Nurse Koch during the 10:30 a.m. phone call that he was on his way to the
hospital to review the EKG results. (3) Nurse Koch testified that it was her "understanding"
that Dr. Williamson was on his way to the hospital. According to Nurse Koch, Dr.
Williamson did not tell her to call him back with the EKG results and she does not recall
whether she did so. Dr. Williamson testified that he had worked with Nurse Koch before
and that she had always called him with test results. He testified it was unnecessary for
him to ask Nurse Koch to call him if a patient's test results were abnormal, because it was
her responsibility to do so. He also testified that he did not always come by the hospital
to personally review a patient's EKG results because his office was not near the hospital.

 Between 11:30 a.m. and 11:45 a.m., Nurse Kathleen Floyd, a registered nurse
assigned to the intensive care unit, came to the emergency room to relieve Nurse Koch for
lunch. After checking on Kelso, Nurse Floyd ordered a second EKG, which was performed
at 11:47 a.m. At 12:10 p.m., she called Dr. Williamson with the EKG results. He advised
Nurse Floyd that he was on his way to the hospital. Dr. Williamson arrived at the hospital
at approximately 12:35 p.m., determined that Kelso was experiencing a coronary event,
and moments later, ordered that she be given nitroglycerin. Dr. Williamson also
recommended that Kelso be given a medication known as a tissue plasminogen activator,
or "TPA." (4) TPA was administered to Kelso about 2:25 p.m. At approximately 4:10 p.m.,
Kelso was transferred by ambulance from Gonzales Hospital to Citizens Hospital in
Victoria, Texas for further treatment by Dr. Kurtis Kreuger, a cardiologist. 

 Kelso sued Dr. Williamson, contending that she suffered injuries due to the
unreasonable delay in treating her acute myocardial infarction. Kelso contends Dr.
Williamson violated the applicable standard of care by failing to timely diagnose and treat
her. 

 The case went to trial before a jury. At the close of the plaintiffs' evidence at trial,
the trial court granted a motion for directed verdict in Dr. Williamson's favor. (5) This appeal
ensued.

II. Standard of Review 


 The Kelsos contend the trial court erred in granting a directed verdict because they
presented sufficient evidence that Dr. Williamson's conduct was negligent and that his
negligence caused Kelso's injuries. Specifically, they contend they presented expert
witness testimony sufficient to establish the applicable standard of care, that Dr.
Williamson breached that standard, and the breach caused Kelso's injuries. 

 In reviewing a directed verdict, an appellate court follows the standards for
assessing the legal sufficiency of the evidence. (6) The court should consider all evidence
in the light most favorable to the party against whom the verdict was instructed, crediting
favorable evidence if reasonable jurors could and disregarding contrary evidence unless
reasonable jurors could not. (7) The court may consider uncontradicted evidence favorable
to the movant. (8) 

 We decide whether there is any evidence of probative value to raise an issue of
material fact on the question presented. (9) When no evidence of probative force on an
ultimate fact element exists, or when the probative force of testimony is so weak that only
a mere surmise or suspicion is raised as to the existence of essential facts, a directed
verdict is proper. (10) The trial court should direct a verdict when reasonable minds can draw
only one conclusion from the evidence. (11) If the record contains any probative and
conflicting evidence on a material issue, a directed verdict is improper and the case must
be remanded for the jury to determine that issue. (12) If reasonable minds could differ as to
the controlling facts, a trial court errs if it grants a directed verdict and refuses to submit the
issues to a jury. (13) The reviewing court may affirm a directed verdict even if the trial court's
rationale for granting the directed verdict is erroneous, provided it can be supported on
another basis. (14) 

 III. Applicable Law (15) 


 The elements that must be proven for a medical malpractice action are: "(1) a
physician's duty to act according to a certain standard; (2) a breach of the applicable
standard of care; (3) an injury; and (4) a causal connection between the breach of care and
the injury." (16) Expert testimony is necessary in a medical malpractice case to meet the
plaintiff's burden as well as to establish or preclude summary judgment. (17) 

 The threshold question in a medical malpractice case is the standard of care. (18) The
applicable standard must be established so the fact finder can decide if the defendant
deviated from it. (19) In medical malpractice cases, the standard of care must be established
by expert testimony unless the mode or form of treatment is a matter of common
knowledge or is within the experience of a layman. (20) An expert cannot merely state he
knows the standard of care and conclude that it was met. (21) The expert must state what the
standard is and say what was done to meet it. (22) 

 During the physician-patient relationship, the physician has a duty to act as would
a physician of reasonable and ordinary prudence under the same or similar
circumstances. (23) Accordingly, a physician's failure to so act constitutes a breach of that
duty. (24) 

IV. Analysis


A. Standard of Care


 Dr. Williamson moved for a directed verdict on grounds that the Kelsos failed to
present expert witness testimony establishing the applicable standard of care and that Dr.
Williamson's conduct breached the standard. The trial court granted the directed verdict. (25)

 The Kelsos contend that they presented expert testimony establishing the applicable
standard of care and that Dr. Williamson breached the standard. In support, the Kelsos
point to a statement by their expert, Dr. William C. Janss, that "[t]he standard of care is a
-- a benchmark that establishes at what level a -- or what -- what would be appropriate
care for a patient based on the practices of the physicians in that community." The Kelsos
also presented the following deposition testimony by Dr. Janss:

Q [by plaintiffs' counsel]: All right. Could you tell the Jury what you believe
the standard of care is in this case as it applies to Doctor Williamson?


A [Dr. Janss]: Well, start from the beginning. First of all, it was incumbent
upon Doctor Williamson to recognize this patient had risk factors for
cardiovascular disease. He in fact, had done that. It was then incumbent
upon him to -- to (inaudible) or had opportunities to talk to the patient to
encourage her to modify her -- her living standard, or living activities, to
reduce her risk for cardiovascular disease. It's my opinion he did not do that.

 It was his -- a requirement that he recognize the patient was -- when
she presented to the emergency room with the symptoms that she did of
nausea, vomiting and tightness radiating to her shoulder on the day of
10/5/99, that she had -- that there was a probability -- a -- a -- a risk that
this may well represent a cardiac event. In fact, he did recognize that.

 It was then his responsibility to see and evaluate the patient on a
timely basis and order appropriate tests. He did order appropriate tests. He
did not see the patient in a timely basis.

 The standard of care for a -- for responding to a patient's --
notification of a patient's arrival to an emergency room in the State of Texas
in an emergency room setting is 30 minutes. It's required by Federal law that
hospitals who -- who receive Federal funds in the form of Medicaid or
Medicare or whatever establish certain standards of care for -- or require
certain requirements for response to emergency -- emergency room. And
in fact, the standard established with these smaller hospitals in Texas is 30
minutes. He did not meet that standard.


. . . . 


Q: Okay. What does the standard of care require of the family practice
doctor presented with the situation as Mrs. Kelso presented on October 25th,
1999, in regards to following up after these appropriate tests were, in fact,
ordered by the doctor?


A: The standard of -- of care, as it applies to this circumstance, is the doctor
needed to make himself present as soon as possible, I believe within 30
minutes.


Q: Why is that?


A: Because in this circumstance, number one, the standard is that any
patient who comes to the ER needs to be seen in 30 minutes; but in this
particular circumstance, as time passed, there was going to be increasing
risk of increasing damage to the heart due to the lack of circulation to the
heart caused by a clot in one of the arteries it feeds on.


Q: In a small town like Gonzales, what if it was a situation where he was
physically -- it was impossible for him to be there in 30 minutes, what would
the standard of care require?


A: Well, that's why we provide a doctor on call for the emergency room that's
in proximity, which in that situation did exist here.


Q: And did Gonzales Hospital -- Memorial Hospital have a doctor on call that
day?


A: Yes. 


Q: When was the first time that Doctor Williamson actually showed up at the
hospital to see Mrs. Kelso on October 25th, 1999?


A: Doctor Williamson arrived at the hospital at 12:45.


Q: Is that within the standard of care to arrive over two hours after the initial
call?


A: No.


Q: Why not?


A: It's not in the standard -- the standard of care for the emergency room
patient is a patient to be seen in 30 minutes and the standard of care as
applied to someone who is undergoing a myocardial -- or what we suspect
is a myocardial infarction, that the patient be seen as soon as possible.


. . . .


Q: When someone is having an acute heart attack right now, what does the
standard of care require for family practice doctors such as yourself or
Doctor Williamson in an emergency room setting?


A: The standard of care requires that the physician evaluate the patient as
quickly as possible, as -- as quickly as he can get to that person. If he can't
get to that person quickly, he should find any other doctor who can get there
quicker. And that's certainly within 30 minutes.

 And the patient needs to be evaluated and
determination--determination made as to whether, in fact, it appears that--
that the patient, based on the physical examination, history and other tests
that may be ordered, is having, in fact, an acute myocardial--or having a
heart attack.

 And if that determination is made, then other therapies have to be
considered that may reverse this process, one of which might be the
administration of what's commonly known as clot-- a clot buster. That is not
without risk. It's a--because it can cause bleeding complications, and so it's
required for the physician to evaluate the patient as to whether they would
tolerate that procedure.


. . . .


Q: Okay. What are the benefits of--for a patient suffering a new onset heart
attack of receiving--of receiving timely administration of a clot busting drug
such as TPA?


A: Well, if given timely, the drug will dissolve the clot that's formed and block
the artery, and therefore blood flow will return to the portion of the heart
that's been deprived of the blood flow, and therefore undergoing damage. 
With the return of the blood flow and oxygen, that heart muscle can recover
and injury to the heart can be avoided. 


. . . .


Q: Okay. I want to go back to the standard of care issues that were you
were [sic] addressing earlier, Doctor, and let's break it up, since there's been
a number of objections. But starting at 10:30 when the doctor first got the
call and was relayed the information by the nurses, I believe it was Nurse
Koch at that time. What did the standard of care require of Doctor
Williamson at that time, at 10:30, when he received the information that's
recorded that the nurses gave to him, and also that he's testified in his
deposition that he did receive? What did the standard of care require from
him at that time?


A: The standard of care required, number one, that he insure that this patient
be seen by a physician within 30 minutes, either by himself or another
physician if he needed to arrange the -- 


Q: Was that done?


A: No. 


Q: What else would the standard of care require?


A: If he suspected a myocardial infarction, which evidently he did given that
he ordered cardiac enzymes and EKG, that he insure that the patient be
seen at the quickest possible time, even less than 30 minutes.


Q: Was that done?


A: No.


Q: And was that a violation of the standard of care?


A: Yes.


Q: And what else did the standard of care require?

 

A: Well, the standard of care requires that upon evaluating the patient, or
person, and receiving the -- the history and exam, the data, that if he
concluded that she was having a myocardial infarction, which she did a little
later, that she -- then the various therapies that would be available to a
patient with this setting, a rural hospital, be discussed with the patient. The
risks, the benefits, and that that -- if they elected to proceed with that
medicine, that it be administered in the most timely fashion possible. And
that medicine in discussion here would be what we refer to as TPA, or a clot-buster -- clot buster.


Q: And was that done in this case?


A: No. 


Q: When you talk about, you know, the reasonable time period for
recognizing that Mrs. Kelso is suffering onset of a heart attack and getting
the clot busting drug administered, what time period are we talking about,
from like recognizing the heart attack to actually administering the drug?


A: Well, I was able to pull some information from a -- study that was
performed by HCFA in this time frame, actually which I think our hospital
participated in, and I suspect this hospital may well have also because it was
kind of a state-wide study. And that indicated that it's -- and the study -- I
found a study that was performed in Texas at that time, and the Texas
baseline was 38 and-a-half minutes from recognition to administration of
thrombolytics. The best in the United States was 21 minutes. 


. . . .


Q: Okay. Had the standard of care been met in this case, what would've
happened with regards to Mrs. Kelso's presentation at the Gonzales
Memorial Hospital with symptoms of a heart attack on October 25th, 1999?


A: Well, had the standard of care been met, she would've been administered
TPA in a timely fashion. Let's say, at -- at the latest, that Doctor Williamson
was first notified at 10:30 and arrived at 11, and had met the standard of
care for Texas, he would've (inaudible) examined the patient and so let's say
another ten minutes. Well, actually, I need to start over on this.


Q: Okay.


A: What he needed to do was call the physician who was on call and asked
him to come over, and presumably that could've happened within 15
minutes. That's what I (inaudible). I mean, you wouldn't want to wait the
whole 30 minutes on a patient where you have the option of getting someone
in earlier.

 So let's say the other doctor could've arrived in 15 minutes, and it took
him 10 minutes to evaluate the patient. It really doesn't take any longer than
that. So that would mean that -- that by, let's say, 11 o'clock, the patient
would've been evaluated; the TPA could've been administered by say, 11:40.

 And that would represent two hours and approximately 40 minutes
earlier than the TPA was actually administered, and that would've
represented a significant savings in heart tissue. And heart tissue would've
survived that didn't survive as a result of the delay. 


. . . . 


Q: When Doctor Williamson arrived at the hospital at 12:45 -- I believe that's
the right time, isn't it?


A: Yes.


Q: If that's the earliest he could've been there, what would the standard of
care require of him at that point, at 12:45, as -- as far as the timely
administration of the clot busting drug?


A: He -- he would then have to rely on the physician who was on call for the
emergency room to provide the timely response.


Q: Okay. But -- but my question is, if at 12:45 --


A: Yes.


Q: -- if that's his first involvement in the case -- 


A: Oh.


Q: -- for example, hypothetically, then, what would the standard of care be
for him at 12:45 --


A: Well -- 


Q: -- as far as timely administration of the clot busting drug?


A: The standard of care would be that that drug be administered 15 minutes
from his arrival.


Q: Now, even if you take out the -- everything else before 12:45, did Doctor
Williamson meet the standard of care at 12:45?


A: No, he didn't.


Q: Why not?


A: Because the TPA was not actually administered until, I believe it was 2:30
or thereabouts. Let's see. It was administered at 2:25 in the afternoon. 


 Dr. Williamson argues that Dr. Janss failed to explicitly state the applicable standard
of care and failed to explain how Dr.Williamson's conduct breached that standard. Dr.
Janss acknowledged that Dr. Williamson was not informed of Kelso's EKG results until
12:10 p.m. and that he arrived at the hospital within thirty minutes of being so informed:

Q [by Dr. Williamson's counsel]: Okay. But it's a -- it's a fact, in the
documents that you've reviewed, that there's evidence that Doctor
Williamson was first informed of the EKG findings on Mrs. Kelso at 12:10; is
that correct?


A [Dr. Janss]: Yes.


Q: And it's also a fact that Doctor Williamson was at the hospital by 12:35;
is that correct?


A: Yes.


Q: So he was there actually within 30 minutes of when he was notified of the
EKG findings; is that correct?


A: Yes. 

 

Q: Okay. Tell me, what time do you think the TPA should've been given to
Mrs. Kelso?


A: Within ten minutes of reviewing the first EKG by a physician.


Q: Can you repeat that because I didn't hear you?


A: Within ten minutes of reviewing the first EKG by the physician examining
the patient.


. . . .


Q: My question was: Is there something in those two articles that you
produced that says that, 10 minutes?


A: No. There's a standard that's referred to in the articles, you know, what
they-- what their current experience is.


Q: Okay. That's my -- I guess -- I'm sorry if I'm misspeaking, but what I'm
trying to try to ask is, in those two articles that you produced, do they say the
standard that you're referring to?


A: My 10 minutes wasn't a standard, though.


Q: It's an optimum?


A: Yes. 

 

Q: Okay. What -- is there something in writing about what is the minimum
level of -- or the maximum level of time after the physician reads the EKG
-- what am I trying to say? Is there something in writing which says the
standard requires the doctor to start the TPA within 10 minutes of reviewing
the EKG which shows an acute myocardial infarction?


A: Well, what's in writing there is the time elapsed from presentation of the
patient till administration of the EKG. Various things took place, including
obtaining an EKG and administering aspirin and starting IVs and all of those
other things. And so I don't know if I can -- there -- there's nothing in there
that says it's from reading the EKG, no.


Q: That's just your opinion then?


A: No. Once again, I told you what that was, what the optimum was. And if
you want to ask me what the standard is, I'll refer to the references that I
brought. 


 On cross-examination, Dr. Janss conceded that the federal law requiring a hospital
to respond to a patient within thirty minutes of the patient's arrival at an emergency room
did not require Dr. Williamson to make emergency room doctors available within thirty
minutes of a patient's presentation at an emergency room. In any event, it is undisputed
that Dr. Williamson arrived at the hospital within thirty minutes of being informed of Kelso's 
EKG results. Dr. Janss was asked whether the hospital study states that a doctor or health
care organization violates the standard of care by failing to administer TPA to a patient
within 38.5 minutes; he responded, "No. I said that." 

 Although Dr. Janss conceded that it was reasonable for Dr. Williamson to examine
Kelso and discuss with her the potential risks and benefits of administering TPA prior to
ordering the drug, (26) he also testified that (1) the standard of care required Dr. Williamson
to administer TPA within fifteen minutes of his arrival at the hospital at 12:45, and (2) that
Dr. Williamson breached the standard of care by failing to administer TPA to Kelso until
2:25 p.m. 

B. Causation 


 Although Dr. Williamson's argument in support of his motion for directed verdict
focused on the Kelsos' alleged failure to establish the applicable standard of care and
breach of the standard, we must also address whether the trial court properly granted the 
directed verdict on some other basis. (27) Therefore, we next address whether the Kelsos
presented expert witness testimony sufficient to raise an issue of material fact on the issue
of causation. (28) 

 On cross-examination, Dr. Janss testified as follows:

Q [by Dr. Williamson's counsel]: Do you agree with me that even though TPA
or the clot busting drugs are highly effective drugs, good drugs, help with
limiting heart damage, that they can't eliminate completely heart damage in
a patient who sustains an infarction?


A: Well, you've--you've asked me a question that answers itself. In other
words, you said that they can't eliminate damage in a patient who suffers an
infarction. Well, if they've suffered an infarction, that's damage; but they can
eliminate infarctions.


Q: Okay. In your opinion, did Mrs. Kelso sustain an infarction?


A: Yes.


Q: Okay. So in Mrs. Kelso's case, do you agree with me that TPA, even if
it had been administered sooner than when it was, couldn't have eliminated
completely any and all damage as a result of that infarction?


A: No. I think that there's possibility that it could've eliminated completely the
the [sic] myocardial infarction.


Q: Possibility, but not a probability?


A: Yeah. I mean, I think it would be medically probable that she would not
have suffered a myocardial infarction if she would have been treated
promptly. She would not have suffered a myocardial infarction.


Conclusion


 

 Considering the evidence in the light most favorable to the Kelsos, we hold that they
presented by expert testimony some evidence concerning the applicable standard of care
and that Dr. Williamson deviated from that standard of care. We also hold that Dr. Janss's
testimony constituted some evidence as to causation. Accordingly, we hold that the trial
court erred in granting a directed verdict. We therefore sustain the Kelsos' issue, reverse
the trial court's judgment, and remand the cause to the trial court for further proceedings
consistent with this opinion. 

Dr. Williamson's Cross-Point


 In a cross-point, Dr. Williamson contends that the trial court should have excluded 
Dr. Janss's testimony as to the standard of care applicable to Dr. Williamson, breach of
that standard, and causation, on grounds that Dr. Janss's testimony is irrelevant and
unreliable under rule 702 of the rules of evidence, (29) and E.I. DuPont de Nemours & Co.,
Inc. v. Robinson, 923 S.W.2d 549 (Tex. 1995). Specifically, Dr. Williamson argued that
because Dr. Janss failed to base any of his opinions on an identifiable standard of care,
his opinions were unreliable and inadmissible under rule 702. Dr. Williamson also argued
that the standard of care used by Dr. Janss was "incorrect" because it was based on an
"optimum" standard of care and that his testimony failed to set forth any reliable opinion
on causation. (30) In addition, Dr. Williamson argued that instead of being based on proper
legal concepts, Dr. Janss's testimony was based on what Dr. Janss would do personally. 

 Whether a witness is qualified to offer expert testimony is a matter committed to the
trial court's discretion. (31) We gauge abuse of discretion by whether the trial court acted
without reference to any guiding rules or principles. (32) 

 We have already determined that considering the evidence in the light most
favorable to the Kelsos, Dr. Janss's testimony presented some evidence concerning the
applicable standard of care and that Dr. Williamson deviated from that standard of care. 
Accordingly, we hold that the trial court did not abuse its discretion in admitting Dr. Janss's
testimony. We overrule Dr. Williamson's cross-point. 

 


 

 LINDA REYNA YAÑEZ,

 Justice






Memorandum opinion delivered and filed 

this the 21st day of December, 2006. 


1. The plaintiffs' live petition alleges that Williamson's failure to properly diagnose and treat Daisy
Kelso's acute myocardial infarction resulted in her disabling injuries. Throughout this opinion, "Kelso" refers
to Daisy Kelso. 
2. The Kelsos initially sued various other health care providers; however, the case proceeded to a jury
trial solely against appellee, Dr. Williamson. 
3. We will accept as true the facts stated in the appellant's brief unless another party contradicts them. 
See Tex. R. App. P. 38.1(f); Roberts v. Roberts, 999 S.W.2d 424, 439 (Tex. App.-El Paso 1999, no pet.). 
4. This medication is also known as a "clot buster."
5. Dr. Williamson orally moved for a directed verdict on the issue of negligence. He argued there was
no expert testimony establishing negligence. The trial court stated its finding that Dr. Williamson was not
negligent. A motion for directed verdict may be in writing or may be made orally. See Dillard v. Broyles, 633
S.W.2d 636, 645 (Tex. App.-Corpus Christi 1982, writ ref'd n.r.e.).
6. See City of Keller v. Wilson, 168 S.W.3d 802, 823-27 (Tex. 2005) (stating that the test for legal
sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the
verdict, and appellate no-evidence review)
.
7. See City of Keller, 168 S.W.3d at 827. 
8. See Nichols v. Nichols, 727 S.W.2d 303, 306 (Tex. App.-Beaumont 1987, writ ref'd n.r.e.).
9. Bostrum Seating, Inc. v. Crane Carrier Co., 140 S.W.3d 681, 684 (Tex. 2004); Szczepanik v. First
S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994).
10. Kingston v. Helm, 82 S.W.3d 755, 758 (Tex. App.-Corpus Christi 2002, pet. denied); Villarreal v.
Art Inst. of Houston, Inc., 20 S.W.3d 792, 796 (Tex. App.-Corpus Christi 2000, no pet.).
11. Vance v. My Apt. Steak House, Inc., 677 S.W.2d 480, 483 (Tex. 1984).
12. See Szczepanik, 883 S.W.2d at 649; White v. Southwestern Bell Tel. Co., 651 S.W.2d 260, 262
(Tex. 1983).
13. See Latham v. Castillo, 972 S.W.2d 66, 68 (Tex. 1998). 
14. Reyna v. First Nat'l Bank, 55 S.W.3d 58, 69 (Tex. App.-Corpus Christi 2001, no pet.); Villarreal, 
20 S.W.3d at 796. 
15. In 2003, the legislature repealed the Medical Liability and Insurance Improvement Act ("Article
4590i") and codified it in chapter 74 of the civil practice and remedies code. See Acts 2003, 78th Leg., ch. 204,
§ 10.01, eff. Sept.1, 2003 (now Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001-74.507 (Vernon 2005 & Supp.
2006). Chapter 74 governs cases filed on or after September 1, 2003; Article 4590i continues to govern cases
filed before that date. The present suit was filed before September 1, 2003 and is therefore governed by
Article 4590i.
16. Smith v. Mossbacker. 94 S.W.3d 292, 294 (Tex. App.-Corpus Christi 2002, no pet.) (quoting Day
v. Harkins & Munoz, 961 S.W.2d 278, 280 (Tex. App.-Houston [1st Dist.] 1997, no pet.)). 
17. Blan v. Ali, 7 S.W.3d 741, 744 (Tex. App.-Houston [14th Dist.] 1999, no pet.). 
18. Jones v. Miller, 966 S.W.2d 851, 854 (Tex. App.-Houston [1st Dist.] 1998, no pet.). 
19. Id. 
20. Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 876 (Tex. 2001); Blan, 7
S.W.3d at 744; Armbruster v. Mem'l Southwest Hosp., 857 S.W.2d 938, 941 (Tex. App.-Houston [1st Dist.] 
1993, no writ).
21. Armbruster, 857 S.W.2d at 941. 
22. Id.; Nicholson v. Naficy, 747 S.W.2d 3, 4-5 (Tex. App.-Houston [1st Dist.] 1987, no writ).
23. Chambers v. Conaway, 883 S.W.2d 156, 158 (Tex. 1993).
24. Id.
25. In arguing to the trial court in favor of the motion for instructed verdict, Dr. Williamson's counsel
stated, "At this point, we're just submitting our Motion for Instructed Verdict based on the first issue, which
would be negligence-- I've actually got an alternate, but the first element of a cause of action in medical
malpractice, which is negligence. We're not arguing causation, but we also have a motion on that."
26. Prior to ordering TPA, Dr. Williamson consulted with a cardiologist. It is undisputed that TPA was
administered at 2:25 p.m. 
27. See Reyna, 55 S.W.3d at 69; Villarreal, 20 S.W.3d at 796. 
28. See Bostrum Seating, Inc., 140 S.W.3d at 684. 
29. See Tex. R. Evid. 702. Rule 702 provides:


If scientific, technical, or other specialized knowledge will assist the trier of fact to understand
the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an opinion or
otherwise. 


Id. 
30. At the hearing on the motion to exclude Dr. Janss's testimony, Dr. Williamson's counsel stated that,
"[w]e are not arguing that Doctor Janss isn't qualified as an expert witness to give medical expert opinions. 
But the problem is, he's got to base those opinions on the correct legal standard, which was never done."
31. United Blood Servs. v. Longoria, 938 S.W.2d 29, 30 (Tex. 1997).
32. Id. (citing E.I. Du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995)).